We're happy to hear arguments in our first case, Ballard v. Bank of America. Mr. Simmons? May it please the Court? I am Roger Simmons. I represent Kelly Ballard, the wife and the... It's a big room. Maybe bring the microphone close to you. Thank you, Your Honor. And one old judge, anyway, two young judges. Well, this is an old counsel. I've been around a long time, as Your Honor is probably well aware. Ms. Eisner and I were the counsel in Webster Riggs' case that was in front of the District Court 20 years ago this year in front of the other Judge Motts. And we are happy to be in front of this Court and Your Honor on an altogether different fact pattern than that case. It is one which we keep hearing from the Bank of America is governing this case. But, in fact, this is not the Webster Riggs case. I lived it. It's not the same. This is a situation where our client, Kelly Ballard, the wife in the case, repeatedly signed the last page of a number of notes beginning back, probably back in 2006, but certainly in 2008. And thereafter, each time being told they involved $1 million lines of credit. Therein lies the critical fact pattern that began in 2008. I lost what you said. She was told they involved what? When her husband handed her the document to sign, it was the last page of each one of the documents. Right, that part I understood. And he told her that the guarantee she was signing was for a $1 million line of credit, when, in fact, they varied from $16 million to $4 million to $8 million from time to time. And she had no clue, no idea, was never in contact with the bank, had no e-mails, no communication. Well, it sounds like her husband defrauded her. Well, certainly he did. Well, he's not here today. Well, we're not here. We are to one extent. There is an unjust enrichment count here into which that does play. And it certainly impacts in other aspects of the case, which I'll try to make clear to you, Your Honor. There are no guarantees that I make it perfectly clear. And she thought she was signing as a guarantor on what amount of credit? A $1 million line of credit, when, in fact, the notes went from $4 million to $16 million. Well, what was the collateral put up for that, the Maryland House and the California Winery? Eventually. That was in 2011. In 2008, there was no collateral placed. In 2008, the fact pattern is as laid out in our complaint. And that's what I want to bring the Court's attention to. There are 20 pages in the record that lay the facts out because this is a case that was decided on a motion dismiss. It was not, there was no evidence taken, no answer filed, no discovery. It went forward on the basis of these bare facts. And among the facts alleged was that the entity borrowing the note, Food Swing, was itself creditworthy and fully able to collateralize the loan. Do you, so your argument is that she is obligated up to $1 million? Well, that $1 million was paid back many years ago. That isn't that one. But I mean, I would take that in a heartbeat, Your Honor. A million dollars we could live with. The problem here is much bigger than that. I'm sorry. Isn't she obligated up to the value of the Maryland House and the California Winery? That's what Bank of America is claiming. And what we're trying to explain under ECOA, under the defensive use of ECOA, the way she was treated here as a single unit with her husband, as though she was one person, never communicated with, never treated separately, was a classic ECOA violation as Virginia Supreme Court held in the Urey case. I think I understand your legal theory. What I'm trying to understand is your view of the facts. So does she have other assets, is what I'm trying to get at, other than the Maryland House and the California Winery? She has, I think, another condo unit out in California. Well, has the bank made any claim on that? They claim every single piece of asset, fur coats and diamonds or whatever she once had. They claim access to everything she ever owned. But they got, in the 2011 reorganization, they got quickie access and fast-track access in the form of deeds of mortgage, deeds of trust to the winery and the cops. But does that satisfy the debt? Well, they haven't foreclosed on those. Well, if they do foreclose on those, will that satisfy the debt, or are they going to go after her jewels and fur? Who knows on a foreclosure? You don't know the answer to that. Sir, you know the value of the property, and you know what the debt is. Well, certainly I know the value, but I also know that foreclosures don't result in the full value being achieved. Neither on the winery, which at one point was worth $20 million, will probably sell for a fraction of that. The house at one point was worth $11 million, will probably sell for a tiny fraction of that. What's the total indebtedness that the bank now claims? Well, that's a good question. We've asked that. That's why I'm asking you this. We've asked that. It's more than $3 million. It's in the $4 or $5 million range. Sorry, what did you just say? I'm sorry? You did mention a figure among your answer. And what was the figure? Between $3.5 and $4.5 million. I'll let Mr. Sterin address that because we've never gotten an accurate accounting from Bank of America on that. We've asked and we've gotten approximations. Do you dispute that the home and the winery, if sold even in foreclosure, do you dispute that they would satisfy whatever that debt is? I don't know that for sure, Your Honor. Well, nobody knows it for sure. No, you can't. Because they're coming up with all kinds of issues about the winery. Does it have this kind of problem or that kind of problem? The house, they say we're not marketing fast enough and they're going to take it over and market it. And once you put it on a fast track or a foreclosure sale, you don't know where it's going to go or how it's going to be sold. You better sound like you said it. Wait, wait, wait, wait, wait. If I understood what you said, at least at one point, those two assets were worth $31 million. At one point they were, Your Honor. But long prior to that, the food swing and Michael Ballard, her husband, were creditworthy separate and apart from this lady. As we've alleged in the complaint, the guarantee she signed was not even a requirement of the line of credit. It was something they tacked on at the end and he tricked her into signing. But if you look at it. He being, who tricked her into signing it, her husband? You said he tricked her into signing it. Well, her husband is the one that tricked her. But the bank was complicit in it. They never had. He signed it in March 2008? Yes. And the complaint was filed in November 2012? Yes. And what's your position on the statute of limitations? Well, this is a defensive assertion of it. We're trying to assert it as a defensive defense to the guarantee signed only by the wife. We're not trying to invalidate the underlying loan or the transaction between food swing and Bank of America or the transaction between Michael Ballard and Bank of America. When did she first sign the guarantee? Well, she first signed the guarantee thinking it was a million-dollar line. I'm not asking what she thought. I'm asking when she did it. The first time would have been probably in 2006. But the one that's been talked about in this case is 2008. She thought she was renewing an older line of credit at $900,000. And that's what she thought she was signing. And it turned out not to be. It was a whole new loan for many, many millions of dollars. And that was the trick in the fraud that we've alleged in the complaint. On the statute of limitations, Judge Thacker, that issue and the whole idea of her being represented by counsel, competent counsel, is an issue in front of the state court, in front of Judge McCormick, in legal malpractice actions. And, in fact, Judge McCormick had a half-a-day hearing on the statute of limitations issue when she knew whether she knew it and at what point she knew it, and has concluded we are in court and entitled to pursue the discovery theory in that, based upon what happened in 2011. Judge Titus didn't consider any of that, didn't hear it, didn't think about it, and then just presumed it at the end of his ruling. Judge Titus didn't consider the statute of limitations issue? Well, he made a quickie ruling on the end of it. He ruled on it? Yes, he did rule on it. And he ruled on it on the basis of facts, Your Honor, that don't support his ruling. And I certainly go contrary to the structure and content of numerous other courts that have said that defensive use of the statute of limitations in this context is not, defensive use of the ECOA is not prohibited by the statute of limitations. Are the Ballard's still married? One of them lives in- Are they still married? They're still married, technically. So in other words, there's a possibility if you were to have all these notes and guarantees counseled as against Mrs. Ballard, that the trickster himself might be unjustly enriched, because if they later divorced, especially a property in California- Anything is possible. That's what we were speaking about. The man is, he's certainly not my client. He's certainly not in my favor, Your Honor. I would- I didn't ask you if he was your client. I said, then if you win this case on your theory, then there's a possibility that the trickster ends up being the winner. Well, certainly, but that's true of Michael Claude, who sits in jail after having defrauded hundreds of competitors, or hundreds of people up and down the East Coast. That's not what I'm here about. I'm here to get justice for Kelly Ballard, who was the target of the trick, and in this case, the target of the discrimination. If you- Did you- I've got to sum up here. Yeah, I know that, but you have to answer my questions. Yes, Your Honor. Do you assert in your complaint that the husband did any of the tricking at the direction of or instruction of the bank? I assert the tricking and what he did was certainly facilitated by what the bank did. I don't- Yeah. I've not been getting any discovery. I don't know that they did that, and I haven't alleged that, and I don't think it's essential to the ECOA thesis of my case. Was your client an applicant under ECOA? Absolutely not. The argument has been made that that's what the old Webster Riggs case holds, but that's not this case. And do you, and the basis for your claim that her waiver is not effective is conflict of interest on the part of her lawyer. Well, certainly that's part of it, but- What else is it? But, Your Honor, if you could waive it in the way they've done discrimination waiver here, you could waive racial discrimination, you could waive ethnic and religious discrimination. You just sign a document, I waive racial discrimination, and you can do what you want to me because I'm a person of the wrong ethnic makeup. And you cannot so easily get away from a policy. Do you think ECOA is not waivable, or do you think it's not waivable the way it was attempted here? Wrongs under ECOA are waivable certainly when they're being litigated and you're settling the case. They're not waivable in the way that was done here. That doesn't answer my question. Do you think that prior to litigation ECOA claims are waivable? All civil litigation, Your Honor, flows back to damages. And if you're satisfied that you've got your damages paid by some other way, the person that has been discriminated against can waive those damages. In that sense, it's waivable, yes. Okay. Yes, it is. But it's not waivable in the way they're trying to do it here, which could be used to waive bankruptcy rights. You just have someone sign a document and waive it away. Is your claim that the waiver is ineffective based on the manner in which it was executed, generally executed, or that her lawyer had a conflict and it wasn't a knowing waiver? Part. But it's also not waivable because it was a printed part of the document saying, whoever signs this guarantee waives ECOA. That is the inherent flaw, the major flaw in the waiver theory that they're arguing. It's like saying, whoever signs this document waives ethnic or race discrimination that's involved in granting it to the U.S. government. Because it's printed? I'm sorry? Because it's printed? No. You just told me ECOA claims were waivable. After we walked through that, you finally said that ECOA claims are waivable. It's not waived in that way, Your Honor. It can be waived in that way. It's got to be waived in a different context. In what way? Because then you said it's printed. So is it your claim it's not waivable because it's printed? Your Honor is trapping me very effectively. No, I'm not trying to trap you. Well, you are, Your Honor, because I didn't say it because it's printed. Yes, you did. Because it's in the contract, the printed contract. You have to stop talking when I'm asking you a question. You go back and look at the transcript, and I guarantee you this is what you said. You said it's printed. That's what you said in your answer. I never said the word printed until you did. And so I'm asking, when you use the word printed, I'm trying to say the import of that. What do you think the import is? I'm asking you a question. You think you're being trapped, but I'm just asking you that question. Do you think the fact that it's printed means it's ineffective? That's my question I'm trying to get to. I may have said that's not what I meant, Your Honor. Okay, what do you mean, sir? I'm saying that when you sign a contract, there is a clause in there that says you're waiving certain ethnic or, in this case, marital discrimination, you're waiving it. And that, I'm saying, even if it's signed with knowledge of the person, cannot affect a waiver of that right. It's one of the important rights that Congress and the President enacted in the ECOA saying that you, Your Honors, are obliged to enforce these laws that prohibit marital discrimination. Okay, thank you very much. Thank you, Your Honor. A little bit of time for rebuttal. Good morning, and may it please the Court. My name is John Sterin. I represent Bank of America. With me at counsel's table is Amy Garber. Mr. Sterin, what is the bank's position about what Mrs. Ballard owes? What has she given an indemnity agreement for? Well, in terms of the outstanding loan, it is, as Mr. Simmons indicated, about $3.5 to $4 million is what's left on the balance. The guarantees given to the bank were unconditional guarantees. They will be satisfied by the two properties at issue, the Potomac property and the winery. I believe the appraisal, the last appraisal on the Potomac property is over $6 million. So is it your position that if the assets, those two assets, did not satisfy the judgment that you could go after her for independent assets she had because of the agreements you have? The initial reason for entering in the agreements was the identification of joint assets by Mr. Ballard in obtaining the loan. I'm glad to hear that, but I'd really appreciate an answer to my question. Yes, Your Honor. The guarantees are unconditional guarantees. The statute, though, doesn't really permit that, does it? It permits you to get her on the hook for the collateral, but not for other assets that she may have or may have in the future. The guarantee in the- Well, the guarantee may do it, but I'm talking about the statutory provisions. I believe it does, Your Honor. I believe in the Fourth Circuit decision in Riggs v. Lynch- Well, I'm more interested in what the statute itself says than your interpretation of any case law. Okay, I'm sorry, Your Honor. Can you repeat the question for me? Yes. The way I read the statute, and I'm very welcome to help from you on what ECOA says, but what I read is that it says that it permits the bank to require the guarantee for the amount of the collateral, but it doesn't from this other spouse, but doesn't give you any right beyond that. And I believe Your Honor is referring to Section 1691DA, which specifically allows for the signature of both parties to a marriage for the purpose of creating a valid lien, shall not create a discrimination under that subchapter. And one could read that, I think, correctly, Your Honor, to say that would be restricted to specific property that is jointly owned. The way the case law has interpreted the statute- Okay, but that's not what I'm asking you. I'm not asking you about the case law because it doesn't seem to me the case law has really addressed this. And I think in most cases, the collateral that's offered is all of the assets. That's why I was very interested in whether Ms. Ballard had other assets. We don't know if Ms. Ballard has any individually owned assets. But you claim that if you cannot satisfy the debt, you can go against any other assets she has. I'm indicating that the guarantee that she had signed is an unconditional guarantee. And my understanding is that based on the understanding of what an unconditional guarantee is, that she is required to satisfy the debt from whatever resources she has. Unless it's contrary to a Federal statute. Unless it is contrary. Well, certainly we wouldn't allow her to, we wouldn't want her to be contrary to a Federal statute. But bear in mind, Your Honor, that in the Seventh Circuit decisions in Moran, in the Fourth Circuit decision in Riggs v. Lynch, and the Third Circuit decision in Mid-Atlantic v. Hansen, those addressed far greater than just simply assets that one might construe as beyond Section 1691. In fact, the- You know, I would have thought you would be in better shape if you had said no, since you think that these assets are going to cover the debt, that no, we believe she's just limited to those assets. Because now you're hearing a motion to dismiss. And if you're making the claim that all of her assets, privately owned, perhaps acquired in the future, are on the hook, it seems to me you have a real problem with this Federal statute, a problem that has not really been directly addressed by any other court. So relying on precedent doesn't really get you there. Well, Your Honor, the bottom line, the only facts that I know is that the property, the jointly owned property, will satisfy the debt. We have no reason to believe that- Well, then it would seem to me that the bank would be in good shape in front of us to say that it makes no claim with respect to any other assets. In that case, Your Honor, we will make no claim to any other assets other than those. Let me talk to you about the waiver, your argument about the waiver. If the waiver- if you are correct on the waiver argument, this statute would never have any effect. A lender could always require that relief under the statute waived in order to give the loan. Isn't that correct? No, I don't believe that's quite correct. I think as- In what instance couldn't you require the waiver? Well, I think that if the waiver was not clear and unambiguous, as it is here, you would not- Okay, any time that the lender, and lenders usually are represented by good lawyers, any time the lender can get together a clear and unambiguous waiver of this statutory right, then it would do away with the statutory rights. Is that correct? I think that there are certain statutory rights that cannot be waived- I'm asking about these rights under this statute. Well, I think if you have a signer of the document that didn't understand what was going on, that would not be able to- A signer of the document that understands what's going on, understands they're signing a waiver, perhaps doesn't know about the statute, but understands that they're signing the waiver, and the bank makes signing the waiver a condition of giving the loan, and the waiver is clear and unambiguous. Doesn't that just gut the statute? That can't be the rule, can it? It would be as if every time somebody hires somebody, they immediately say, you must sign a waiver to all of your sex discrimination, race discrimination, national origin discrimination, disability discrimination claims. Do you think that would be enforced? Your Honor- Even if it was clear and unambiguous? Well, Your Honor, I'm not quite sure what the answer is to that. But what I have here is a factual situation where over the course of four years, and with the assistance of counsel, Mrs. Ballard signed seven different documents that contained waivers. I understand that. We're only going to your waiver argument. We're not going to the validity of any of your other arguments, but usually I think waivers are controlling, but I just don't see how you can make the case that here, maybe Congress was wrong in enacting this federal statute. Maybe it's stupid, but it did. I think I'm trying to address that waiver argument still by noting the fact that in this fact pattern, we don't have just one instance of signing it. Why would that make any difference? Well, because you're- If she just did it once, it wouldn't be valid, but if she does it twice or three times or four times, it is? No, I'm not saying that, Your Honor. What I'm saying is that in analyzing whether or not a party who signs it is in a position to understand it and to have it enforced against them, you've got a situation here where over the course of four years, with the assistance of counsel again- But I'm asking, so when did it become- When was it that she could have gotten out of it under your theory? I thought your theory was the moment she signed it, she waived it. Okay, so she'd said it the third time, well, I don't want to waive it anymore, and you would have then said, well, you're right, you don't have to waive it now. No, I'm not. No, I don't think it makes any difference that it's four years for purposes of your theory. Well, Your Honor, the cases that I have seen, and believe the only cases that address the waivability of a COA have all indicated that it is a waivable issue, and I've not seen any cases that- Did they come in this context? Certainly, if you were settling the case as part of the settlement, you could waive it. I'm asking from the get-go of the loan or the guarantee. The decisions that I have seen that we have cited are not- Well, maybe you can cite a couple of those decisions. Yes, but I want to make sure I'm clear with your question. Sure. I do not believe are specifically this fact. I think that was your question. But they do, in fact, release a COA, and so from the only case law that I have seen dealing with the issue, and now I think we have sort of an understanding of all the parties that it is a waivable federal issue, it's the only thing I've seen. Do you think it matters? You think that it is waivable from the get-go, don't you? I do. Yes, but do you think it matters? Are you trying to draw us back to the specific facts against the principle? Judge Motz is talking about the general principle. Do you think it matters how it's waived in the initial document? You know, the other side says something about printed. Would it make a difference if it was- I'm not sure that it would, but if the parties- there's evidence the parties had actually talked about it, the parties had written it out as an addendum in handwriting, would that matter? Would that matter to you in your analysis? Would it matter? What I think matters is from the state perspective in interpreting a contract is whether or not the language is clear and unambiguous. So your answer to my question is it doesn't matter how it's executed, it's just the fact that it was executed? I think what matters is that the language is clear and unambiguous. If that is interpreted to cover a code, which I believe it should be in this case, then that is sufficient to waive- So the answer to my- I said I heard the answer to my question. I'm sorry, Your Honor. I said you don't think how it's executed in the contract matters, handwritten or proof that it is a result of some negotiation. In other words, you're close to the line. We're not sure we want to do it, but we might loan you money, but we're not going to do it if we're looking at potential claims. So you have to waive everything. That's a specifically negotiated provision or if it's just in a printed document. Do you think that matters at all? Well, I'm not sure because then you're moving into a situation where you've got sort of undue influence and duress happening upon the borrower, and I don't believe that's the factual situation here. What I think you've got here is a sophisticated borrower with counsel and language that is clear and unambiguous. Well, do you have to win on the waiver argument to prevail here? I do not, Your Honor. I can win on any number of reasons. Let's still look at the statute of limitations argument for a minute. Yes, Your Honor. Which, as I understand, you also don't have to win on. But it's another one of your arguments. I don't think we have to, but I think it's a very strong argument. One thing that I... Everybody, the parties seem to keep talking about continuing violations, but it seemed to me that the 2010 and 2011 documents were independent contracts. They refer back all... conflict this document controls. Well, I don't view them as necessarily independent contracts. I'm sure you don't, but why aren't they? Well, I think what they say by their heading is they are modifications and they are restructurings of the original. Excuse me. Don't they have the language I was talking about, too, to the extent there's a conflict the new document controls? Your Honor, I'm not standing right now. I'm not exactly sure whether or not... You wouldn't claim to the contrary. I'm not claiming to the contrary. That makes no difference as far as you're concerned. I think when you're talking about, and the issue, of course, is one of a continuing practice and a continuing violation, particularly under the Havens decision, which Mrs. Ballard has cited. Well, the bank obviously thought there was a need for a new document in 2010, 2011. It's not as if the borrowers were coming up and saying, we want to make a new document. Well, the bank... What happens is the bank, in every situation where there is a modification, and remember, the modification is an accommodation for the borrower who is... It was an increase in liability, wasn't it? None of them were an increase in liabilities. They were all either restructuring the underlying note or forgiving or borrowing, but there was no increase in any... And that's a crucial issue because... Even if you lost on limitations, can you win? Yes. And what's your theory there? Well, we can win on the waiver, and we can win on the fact that there's no ECOA violation because under the, as I indicated before, under the Moran, under the Lynch, under the Mid-Atlantic v. Hansen decisions, it is not discrimination to require a spouse to sign a guarantee when, in the instance, at the beginning of the transaction, the underlying assets served as collateral are jointly owned. It's simply not an ECOA violation. That only goes up to those assets. But you've made a declaration, I assume it's binding in the court, that you wouldn't go after any other assets of hers. And I will stick by that, Your Honor, because Your Honor indicated that that's what I should do. Well, I'm a lone voice crying in the desert. No, but that still means that there is no discrimination under that condition. And if the bank wants more money, they can come after you personally. Oh, I didn't hear you say that. But I think you have stipulated, you have said to this court that your client limits it to those assets. Your Honor, You agree with that, don't you? I am standing by that position, Your Honor. I thought I heard hesitation. No, I think we hear hesitation. You might want to move to another. I'm trying to stop digging in the hole, Your Honors. But I want to get, let me address one more aspect of statute of limitations, just to make sure, and I think it probably is abundant and clear, but there's continuing discussion about ECOA being used as a defensive claim. And, of course, we are not the plaintiffs in this action. We are the defendants. I don't understand that. I think that I know I have more time, but unless there is any additional questions, You don't have to use all your time. I'm sitting down unless Your Honors have any other questions for me. You haven't been given a chance. Thank you very much. Thank you. Ms. Simmons, you have five minutes. Thank you. A couple of points I want to get back to that seem to be troubling the court. Judge Shedd, I didn't mean to get into an argument over you on the punitive issue. I think you understand the point. In the heat of battle, sometimes I get too excited. But one of the things about the statute of limitations, Judge Thacker, in the 2010-2011 reorganization of these loans, every cent in the earlier part of the loan that had been part of the 2008 transactions and the ones that followed that up to 2010-2011 were paid back. And the money that was involved in 2010-2011 was new money. It was called the tail loan. And it was used to reorganize and do things to, in effect, take over aspects of the assets that were owned by Food Swing, the underlying entity. And it was new money. It was a new transaction. And it involved new rights that the bank took in the form of deeds of trust in the winery and in the house that never existed before that. And so in that sense, Judge Motz is absolutely correct. It was a different transaction. Not only different in the sense of the way it was structured, but a different transaction in the terms of the money loan and the way the rights were shaped. But to the extent that we're talking about continuing harm here, the harm continued because Kelly Ballard had been placed on the hook with the earlier transactions going back to 2008. And she had every cent she owned at risk in this whole transaction. So she was rushed along with an attorney that was paid more money by the bank to represent the bank's interest than anything she could have paid. And she was never in contact with the bank, never had a negotiation session with the bank. And the ECOA violation was just as painful, just as accurate, and just as true 2010 and 11 as it was in 2008. But Your Honor indicated some doubt about the fact this is a complaint and therefore not a defensive action. The Third Circuit has specifically addressed this in a declaratory judgment context where you try to declare a guarantee of the person that has been the target of the discrimination void, but you don't attack the underlying transaction, you don't attack the loan, you don't attack the obligation of the company, the food swine, in which Kelly Ballard never owned one stock, one share, one interest in whatsoever. That entity was never an asset of Kelly Ballard. She never made that loan application. Her husband owned stock in it. She didn't. Her husband was a manager in it. She wasn't. And the fact pattern we have alleged here is one where that credit applicant was fully creditworthy on its own. Is your client an unsophisticated business person or she's not? Oh, absolutely. She's unsophisticated. Yes, she is. In fact, she has difficulty reading. But that's neither here nor there. Well, I ask that question because it may be here or there. It is true. But the point is now. It's not in your complaint that she inherited the winery? Well, if your Honor is asking to the source of their money, I think the family got it through a dot-com company they were involved in and they were newly wealthy people. Okay. And she never really understood how to manage money and how to do things. And she left it a lot to her husband. There's no doubt about that. And this has not been. I'm sorry, Your Honor. No, I was just a little surprised at your allegations this morning that Mr. Ballard had been a trickster. I didn't read that. He had been. I mean, it's laid out in our complaint. Well, I'm paging through it. I'm still can't find it. Well, we have alleged fraud and trickster in several passages in our complaint. We never got to that aspect of the case because. By Mr. Ballard? Well. I just was surprised. There is a whole complaint. Let me say, I was surprised, too. Your Honor is right. It's not spelled out in great detail here, but it's well part of it. They're well aware of it. And there's a complaint. It's not at all in the complaint. There's nothing in the complaint. There's not a complaint that lays it out in great detail. I'm sorry, what is? A state court complaint that lays it out in great detail. We're here in federal court. I know, but. What we have is. They asked Judge Titus to go back and take judicial notice of these other cases. And that's one of them that was very, very clearly laid out. And they're well aware of it. But even before that, Michael Ballard was the one that had the contact with Bank of America, not Kelly. She never met a Bank of America employee, officer, or loan person during the entire time she dealt with them. And their transactions are all with Michael. He got the signature of his wife and brought it back. And the bank never had any contact with her. They simply said, get her signature on this waiver. And all that she saw was that last page. And it's an unfortunate fact pattern, but that's the situation we're at. We never got a chance to develop the factual record and get discovery into what the bank's complicity in that was. We do know, and we've expressly alleged, that the bank never had one e-mail with her, never one letter, never one phone call, never one communication, never one meeting. She was never at a settlement conference with the bank. That's all of the general complaint. Okay, I have one final question for you. Yes, Your Honor. Does the statute give a prevailing party the right to attorney's fees? You know, that's a question I have to address because I'm more interested in getting a defense to my client's huge liability here. I don't know the answer to that, Your Honor. I apologize. What you're interested in is limiting her liability to the two assets? Is that what you're interested in? I'm interested in having the guarantee declared void. So she has no liability at all. To the extent Kelly doesn't have liability, Michael can pay every nickel of it with the assets he has, and that's what I want. See, the whole point of having both people that own it sign the guarantee is so that she can't claim, oh, no, you can't get this because half of it's mine. Well, if the bank wants us to sign over the facility they've made offers here to the court, I'll make an offer to them that if they want to go against the asset and give Kelly her half, I'll be glad to do that. They want to go against these two assets to the full amount of their loan, I guess your client and her husband. And I'm willing to let them do that, but give Kelly her share back, untouched. They're still married, right? I still understand your position. Well, I'm trying to get her guarantee voided. That's the illegal one. They're still married, I think you told me. Yes, we did. Thank you very much. We will come down and greet the lawyers and then go directly into our next case.
judges: Diana Gribbon Motz, Dennis W. Shedd, Stephanie D. Thacker